UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

STEPHEN CARTER WRIGHT,

           Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

1:13-cv-02193-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

Plaintiff, Stephen Carter Wright ("Wright"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 USC §§ 1381-1383f. This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

For the reasons set forth below, the Commissioner's decision is REVERSED and REMANDED for award of benefits.

1 – OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Wright protectively filed for SSI on November 23, 2010, alleging a disability onset date of September 30, 2001.  Tr. 143-40.[1]  After his application was denied initially and on reconsideration, he requested a hearing.  Tr. 50-81, 89-93.  On April 4, 2012, a video hearing was held before Administrative Law Judge ("ALJ") Michael J. Kopicki.  Tr. 29-49.  The ALJ issued a decision on June 12, 2012, finding Wright not disabled.  Tr. 11-28.  The Appeals Council denied a request for review on October 27, 2013.  Tr. 1-5.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR § 416.1481.

## BACKGROUND

Born in 1964, Wright was 46 years old when he applied for benefits.  Tr. 34, 143.  He completed a GED and has past relevant work experience as a forest firefighter ending in 2001 when he was incarcerated until his release in December 2009.  Tr. 34-35, 171, 199-200.  Wright alleges that he is unable to work due to the combined impairments of obsessive-compulsive disorder, severe mood swings, anti-social disorder, and post-traumatic stress disorder ("PTSD").  Tr. 199.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on April 18, 2014 (docket #12).

2 – OPINION AND ORDER

inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999). The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner. *Id*.

At step one, the ALJ concluded that Wright has not engaged in substantial gainful activity since November 23, 2010, the date his application was protectively filed. Tr. 16.

At step two, the ALJ determined that Wright has the severe impairments of PTSD, severe, in partial remission; schizoaffective disorder, bipolar type; obsessive-compulsive disorder ("OCD"); polysubstance dependence, in full, sustained remission; attention deficit hyperactivity disorder ("ADHD"); and antisocial personality disorder. *Id.* At step three, the ALJ concluded that Wright does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 17. The ALJ the determined that Wright has the residual functional capacity ("RFC") to perform a full range of work at all exertional

levels, but with the following nonexertional limitations: he can understand, remember, and carry out simple work on a sustained basis in a setting involving no more than occasional public contact. Tr. 18

Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step four that Wright could perform his past relevant work as a forest fighter. Tr. 22. He made an alternative step five finding that Wright could perform the representative occupations of dairy helper, bottle washer, and rack loader, which existed in significant numbers in the national economy. Tr. 23. Accordingly, the ALJ found Wright was not disabled within the meaning of the Social Security Act. Tr. 24.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## FACTUAL AND MEDICAL BACKGROUND

Since he was a child, Wright has experienced visual and auditory hallucinations (Tr. 384, 387), flashbacks, and nightmares (Tr. 486) as a result of physical abuse from his stepfather. Tr. 313, 488, 499. Through his twenties and thirties, Wright self-medicated with methamphetamine, marijuana, and intravenous drugs. Tr. 487. Also during that period, Wright made multiple suicide attempts by shooting, hanging, and throwing himself in front of a moving truck. Tr. 500.

Wright did not receive mental health treatment until he was incarcerated in 2001. Tr. 487, 414. While being held in Lane County jail, he attempted to hang himself and on August 1, 2002, he was placed under suicide watch at Oregon State Hospital. Tr. 412, 414. Psychiatrist Marvin D. Fickle, M.D., diagnosed Wright with mood disorder and antisocial personality disorder for which he prescribed Prozac and Zyprexa. Tr. 405. After 18 days in the hospital, Wright's auditory hallucinations subsided, his mood returned to baseline, and he was transferred to prison where he began mental health treatment. Tr. 404, 412-13. During the final months of 2002, he was stable and continuing his medication. Tr. 401-03.

On February 27, 2003, Wright told his case manager that he had stopped taking his medication, but felt good, although a "little depress[ed]." Tr. 400. On March 7, 2003, Wright reported he was experiencing some auditory hallucinations of "negative voices" telling him that he is stupid," but did not resume taking his medication. Tr. 395.

On August 7, 2003, Wright explained that he could not fall asleep and was prescribed Diphenhydramine, which helped. Tr. 393-94.

On November 25, 2003, Wright was attending classes to obtain his GED but had difficulty retaining information. Tr. 392. The stress of the classes had increased his

auditory hallucinations but he was unsure he wanted to resume taking medication. *Id.* By December 17, 2003, his hallucinations included the sensation of ants crawling all over his skin, causing him to lose sleep. Tr. 391. He was prescribed Benadryl as a sleep aid and Doxepin as an antidepressant. Tr. 389-90.

In early 2004, Wright began his first prison job at the physical plant. Tr. 389. Throughout 2004, he reported visual, auditory, and tactile hallucinations but was not prescribed antipsychotic drugs. Tr. 383-87. On November 29, 2004, Wright's case worker referred him for a medical evaluation. Tr. 383.

On December 2, 2004, Wright was prescribed a trial of Risperdal for his hallucinations. Tr. 379-81. He continued to take Risperdal through 2005, but was frustrated that he was not having a positive response to the medication. Tr. 370-79.

Sometime in early 2006, Wright stopped taking the Risperdal and on May 16, 2006, he reported doing very well. Tr. 367. He was still experiencing auditory hallucinations but was able to cope. *Id.* His treatment provider discontinued Risperdal. *Id.*

In October 2006, Wright started treatment for Hepatitis C, which increased his hallucinations, depression, and anxiety. Tr. 358-61. On January 16, 2007, he was prescribed Prozac, which helped. Tr. 353-58. After his final Hepatitis C treatment in May 2007, he reported feeling much better. Tr. 348.

On July 24, 2007, Wright was feeling increasingly depressed after an incident in his job at the infirmary and bad news about his family. Tr. 342-47. He was prescribed Remeron instead of Prozac, which proved to be more effective. Tr. 335-42.

On February 15, 2008, Wright was "stressed to the max" because he was sleeping in a dormitory with many other prisoners. Tr. 334. He reported: "I feel like I am going to go off and I don't want to do that." *Id.* He was prescribed Clonidine for anxiety. *Id.*

On April 30, 2008, Wright described obsessive behaviors he was experiencing at his new job in the warehouse. Tr. 328. He explained that stress increased his obsessions. *Id.* His treatment provider increased his prescribed dose of Remeron. *Id.*

On November 19, 2008, Dr. Fickle examined Wright again regarding his hallucinations following his transfer to Snake River Correctional Institution ("Snake River") from Deer Ridge Correctional Institution ("Deer Ridge") and the loss of his kitchen job due to allegations of starting a relationship with the kitchen coordinator. Tr. 322. Dr. Fickle opined that the "reemergence of hallucinations is especially worrisome given his diagnosis and medication regime" and prescribed Risperdal. *Id.* By February 18, 2009, the hallucinations and obsessive symptoms had decreased substantially due to the medication change and reduced stress. Tr. 320.

On April 20, 2009, Dr. Fickle reported that Wright "had been doing reasonably well," but had "markedly increased anxiety" about whether he would return to Deer Ridge to participate in a drug treatment program before his release. Tr. 315, 317. His "mood, energy level, and motivation have all declined with the increased stress," and his hallucinations and OCD symptoms had increased. *Id.*

On June 4, 2009, after returning to Deer Ridge, Wright reported to Rachel Bomberger, PMHNP, that he was feeling increasingly paranoid sand had more auditory hallucinations over the past four months. Tr. 313. He stated that "sometimes I feel like I'm missing my grip on reality." *Id.* Bomberger opined that PTSD might be a primary

diagnosis at some point.  *Id*.  Wright completed the drug treatment program on October 15, 2009.  Tr. 429, 459-61, 466-78.

On August 28, 2009, after Wright reported a consistent hand tremor, Bomberger discontinued Risperdal and started Geodon, that was effective in reducing hallucinations and did not cause tremors.  Tr. 307-12.

On November 16, 2009, shortly before his release, Wright was pleased with his current medication regime, taking Remeron for depression, Clonidine for anxiety, and Geodon for his hallucinations.  Tr. 305-06.

Upon his release in December 2009, Wright moved into the men's shelter at Klamath Falls Gospel Mission ("Mission").  Tr. 524.  On January 20, 2010, Wright established care with Michael D. Thein, M.D, a psychiatrist at the Klamath County Department of Mental Health.  Tr. 524-28.[2]  Dr. Thein conducted a Psychiatric Diagnostic Interview, during which Dr. Thein collected a comprehensive history of Wright's mental illness.  *Id*.  He diagnosed severe PTSD, Bipolar disorder in a stable phase, OCD, Polysubstance Dependence in full remission, and ADHD Inattentive Type.  Tr. 527.  Dr. Thein noted that auditory hallucinations were seen in extremely severe cases of PTSD.  *Id*.  He urged Wright to apply for Social Security Disability benefits because he "will not ever be able to work for the rest of his life" and "is totally psychiatrically disabled."  *Id*.  Dr. Thein increased the prescribed dosage of Geodon.  *Id.*

On February 25, 2010, Wright's symptoms were stable.  Tr. 522-23.

On May 8, 2010, psychologist, Gregory A. Cole, Ph.D., at the request of the State agency, examined Wright and conducted a psychodiagnostic evaluation.  Tr. 499-504.  Dr. Cole

---

[2]  Dr. Thein's medical records (Tr. 508-28, 532-35) are duplicated in part elsewhere in the record (Tr. 484-90, 537-49).

assessed that Wright's "tendency to give up easily on tasks, and the potential for increased psychotic symptomatology under stress" would impact his overall vocational success. Tr. 504.

Wright continued to report stable conditions with persistent voices and paranoia to Dr. Thein on May 27, July 29, and October 28, 2010, and January 27, 2011. Tr. 508-21. On October 28, 2010, Dr. Thein changed Wright's diagnosis of Bipolar Disorder to Schizoaffective Disorder Bipolar Type. Tr. 516.

On January 27, 2011 (signed on March 21, 2011), Dr. Thein conducted a Bio-Psychosocial Assessment, reporting that Wright felt stable with a high dose of Geodon and Remeron. Tr. 511-15. Dr. Thein noted that Wright's PTSD diagnosis was in partial remission. Tr. 514.

On July 28, 2011, Wright reported to Dr. Thein that he continued to feel stable although the voices and paranoia were still present. Tr. 532. Dr. Thein noted that Wright has "some ongoing issues with thought disturbance but they are relatively well controlled . . . although they sometimes are bothersome under stress." *Id*. He continued to assess Wright as "totally psychologically disabled based on his Schizoaffective Disorder and PTSD." Tr. 533, 535.

## DISCUSSION

Wright contends that the ALJ erred by discounting the opinions of his treating psychiatrist, Dr. Thein, and his examining psychologist, Dr. Cole.

## I.    Medical Opinion of Dr. Thein

Dr. Thein treated Wright from January 2010 after his release from prison through July 2011. In July 2011, Dr. Thein opined that Wright remained "totally and permanently psychiatrically disabled" due to PTSD and Schizoaffective Disorder. Tr. 533, 535. He explained

that in "a normal work-like setting, [Wright] would be extremely likely to undergo a serious decompensation." Tr. 535.

The ALJ afforded Dr. Thein's opinion "little weight" because it is based "primarily on [Wright's] 'disabling diagnoses,' rather than a functional assessment of what is the most [Wright] is able to do despite his limitations," and inconsistent with the psychiatrist's own observations as well as the record as a whole. Tr. 21. Wright contests this finding because it fails to give legally sufficient reasons.

The ALJ is responsible for resolving conflicts in the medical record, including conflicts among physicians' opinions. *Carmickle v. Comm'r*, 533 F3d 1155, 1164 (9th Cir 2008). The Ninth Circuit distinguishes between the opinions of treating, examining, and non-examining physicians. The opinion of a treating physician is generally accorded greater weight than the opinion of an examining physician, and the opinion of an examining physician is accorded greater weight than the opinion of a non-examining physician. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). An uncontradicted treating physician's opinion can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F2d 1391, 1396 (9th Cir 1991). In contrast, if the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion. *Lester*, 81 F3d at 830.

The ALJ considered and gave "substantial weight" to the opinions of consulting psychologists, Sandra L. Lundblad, Psy.D. (Tr. 65-76), and Paul Rethinger, Ph.D. (Tr. 51-62), who both determined that Wright could perform unskilled work. Tr. 20. However, the opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the

rejection of the opinion of either an examining physician or a treating physician. *Lester*, 81 F3d at 831 (citations omitted).

The only other medical opinion regarding the scope of Wright's disability is by the examining psychologist, Dr. Cole, who concluded that Wright "exhibited problems in the areas of attention and concentration," with "some difficulty sustaining simple routine tasks, but only mild problems completing a simple multiple-step task." Tr. 504. Dr. Cole's assessment that Wright has "the potential for increased psychotic symptomatology under stress . . . which would impact his overall level of vocational success," although stated in less direct language than used by Dr. Thein, is entirely consistent with Dr. Thein's opinion that in a "normal work-like setting," Wright is "extremely likely to undergo a serious decompensation." Tr. 535. Based on Dr. Cole's consistent opinion, the ALJ was required to provide clear and convincing reasons to reject Dr. Thein's opinion.

As his first reason for refusing to assign Dr. Thein's opinion controlling weight, the ALJ found that "it is not well-supported by [his] own treatment notes, which indicate that [Wright] is psychiatrically stable, shows up for all his appointments, and is doing well at the homeless shelter." Tr. 21. This finding ignores Dr. Thein's explanation that, despite his stability in the structured setting of the Mission where he had been living and working since his release from prison, Wright was susceptible to decompensation under stress. Tr. 533, 535. It also ignores substantial evidence in Wrights' prison treatment records supporting Dr. Thein's opinion that stress triggers Wright's hallucinations even during periods of stability.

First, the stress of prison caused Wright to decompensate. Prior to his incarceration, Wright was working as a forest firefighter without receiving mental health treatment. Tr. 60. However, on his first day of incarceration, Wright expressed the intent to commit suicide after

attempting to hang himself.  Tr. 412.  Eight months later in August 2002, Wright was placed on Suicide Watch in the Special Management Unit of Oregon State Hospital for 20 days after he again expressed suicidal ideations.  Tr. 412, 419, 487, 511.  Wright remained stable for about a year after he transferred from the state hospital to prison, but his hallucinations returned with the stress of attending classes to obtain his GED.  Tr. 392.

Second, although he enjoyed working while in prison, sometimes the stress of work, particularly his placement in the infirmary, aggravated his symptoms.  On July 20, 2007, Wright reported that his infirmary job was stressful and that he was frustrated with the officers on duty.  Tr. 344.  This stress, combined with the news that he could not attend his daughter's wedding, caused Wright to start having hallucinations.  *Id.*  The stress of his job in the prison warehouse increased his obsessive tendencies, drawing a negative comment from his boss.  Tr. 328.  In September 2007, Wright received a "daily fail" at his job in the infirmary due to a staff person reporting he had a bad attitude.  Tr. 340.  He reported to the mental health specialist that he was at a "breaking point."  *Id.*

Third, in November 2008, after being stable for a long time, Wright "began decompensating in the face of what he perceived was an unsubstantiated and unfair allegation, resulting in his loss of multiple privileges and programs" that caused a transfer to Snake River from Deer Ridge.  Tr. 322.  He experienced both auditory and visual hallucinations, depression, and declining motivation.  *Id*.  His treating prison psychiatrist, Dr. Fickle, opined that this "reemergence of hallucinations is especially worrisome given his diagnosis and medication regime."  *Id.*  On February 18, 2009, Dr. Fickle assessed that Wright had stabilized due to a combination of changes in his medication and reduced stress.  Tr. 320.  Furthermore, throughout

his incarceration, stress caused by the alienation of his family and kids' illnesses brought on his symptoms.  Tr. 306, 311, 321–22, 325, 343–44.

The ALJ also noted that Dr. Thein's "assessments of [Wright's] GAF scores are inconsistent with his own documentation of [Wright's] mental status examination."  Tr. 21.  At various times during his treatment, Dr. Thein assigned Global Assessment of Functioning ("GAF") scores to Wright ranging from 46 (Tr. 489) to 53 (Tr. 518).[3]  The ALJ highlighted the inconsistency between these GAF scores and Dr. Thein's descriptive assessment of Wright's condition.  Tr. 19-20.  Although Dr. Thein observed consistent improvement in Wright's mental health over the course of his treatment, his GAF scores did not improve.  They started at 46 on January 20 and February 4, 2010 (Tr. 527), moved up to 50 on February 25 (Tr. 522), 52 on May 27 (Tr. 520) and 53 on July 29, 2010 (Tr. 518), then down again to 47 on October 28, 2010 (Tr. 516), January 27 (Tr. 509) and July 28, 2011 (Tr. 532).  Dr. Thein does not explain that discrepancy.

However, as the ALJ stated, GAF scores are an unreliable indication of Wright's RFC because they only indicate "that the identifiable impairments may exist and need to be evaluated."  Tr. 19.  As explained in the DSM-IV, when symptom severity and the level of functioning are discordant, the GAF score "always reflects the worse of the two."  DSM-IV, pp. 32–33.  GAF scores are used by clinicians to rate an individual's overall level of functioning and can encompass psychological, social, and occupational functioning.  *Id* at 32.  Thus, it can

---

[3] A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas; a score between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job); and a score between 51 and 60 indicates moderate symptoms (e.g., flat affect, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers and coworkers).  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev., 2000) ("DSM-IV").

reflect a person's medical, housing, economic, or employment status, and not necessarily her ability to work. *Id* at 32–34. "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F3d 1161, 1164 n2 (9th Cir 1998). The ALJ correctly noted that "the Commissioner has declined to endorse GAF scores for use in the Social Security disability programs," citing 65 Fed Reg 50746, 50764-65-01 (Aug. 21, 2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings."). Tr. 19. Because GAF scores are not necessarily the best indicator of a claimant's ability to work, they cannot provide a clear and convincing reason to reject Dr. Thein's opinion.

As another reason to reject Dr. Thein's opinion, the ALJ found it "inconsistent with other substantial evidence in the record, such as the opinions of the State agency psychological consultants and the admitted activities of [Wright], including his work activity." Tr. 21. As previously noted, the consulting psychologists opined that Wright was able to work independently without the need for special supervision in a setting with no public contact. Tr. 57-59, 71–73. However, their opinions are not entitled to the "substantial weight" given them by the ALJ. Tr. 20. Not only did they inexplicably treat Dr. Thein as a "non-treating source" (Tr. 53, 67-68), but also failed to consider Dr. Thein's complete treating records. Tr. 53 (through May 17, 2010), 68 (through February 25, 2010). In one key omitted record dated July 27, 2011, Dr. Thein spoke with Ron Hicks, the men's director at the Mission who accompanied Wright to his appointment, about Wright's performance in the Mission's environment. Tr. 532. Mr. Hicks reported that Wright was doing "extremely well," but continued to have flashbacks as well as hypervigilance and

avoidance issues that made "living at the Mission especially difficult." *Id*. After speaking with Mr. Hicks, Dr. Wright opined that "[s]tability in a controlled setting such as living at the Mission is very different than being stable in a work environment." Tr. 533. Although Dr. Thein did not report on the level of supervision Wright received in his laundry job, this conversation gave Dr. Thein more familiarity than the consulting psychologists as to how Wright functioned in a controlled environment.

With respect to Wright's work history, the ALJ noted that, despite his psychotic symptoms, Wright was employed as a forest firefighter for several years before he was incarcerated. Tr. 20, 60, 500. He then worked in prison six hours a day, seven days a week (Tr. 38), in various jobs: the infirmary (Tr. 372), warehouse (Tr. 330), laundry (Tr. 361), and kitchen. Tr. 20, 346. Upon his release, Wright began working six hours a day in the laundry room at the Mission for room and board. Tr. 20, 39, 41. At the time of the hearing he was still working in the Mission laundry without pay, but had moved to his own apartment. Tr. 20, 39, 539. Given this work history and his "descriptions of his daily activities which included washing and folding clothes six hours a day" and the lack of evidence that "a mental health professional or vocational coach" supervised Wright, the ALJ questioned why Wright could not perform competitive work. Tr. 21. He left the record open for Wright to submit evidence describing the nature of his duties at the Mission, but Wright failed to do so. Tr. 21-22, 48-49.

The issue is whether the absence of this additional evidence about Wright's job duties at the Mission reasonably allowed the ALJ to find that Wright could perform competitive work. A close reading of the record belies the ALJ's finding. Even without supervision from a vocational coach or mental health professional, Wright has not worked in

a normal work environment since his incarceration.  The prison jobs were "set courses," for example, in the warehouse, "things [were] labeled for [Wright] to put . . . away."  Tr. 38. And when he lost various jobs due to facility transfers (Tr. 322) or was fired (Tr. 346), or when he requested a job he liked better (Tr. 328–30), the prison facilitated transition into another job.  Even Wright's on-the-job outbursts (Tr. 346) and obsessive tendencies (Tr. 328) in prison did not impede his employability.  For example, although Wright was fired after allegedly threatening people in the laundry, he was moved to a job in the kitchen. Tr. 346.  Yet, as explained above, even his working environment in the prison caused him stress.

Wright's laundry job at the Mission requires that he "separate the whites from the darks, . . . the sheets and the pajamas . . . the jeans from the T-shirts and wash the socks and underwear and shirts together."  Tr. 41.  After the clothes are washed, he dries, folds, and puts them on shelves.  *Id.*  As in the prison, the Mission is an environment intended to support Wright in gaining stability, and his ability to work there does not depend entirely on his performance as would be the case in a competitive work environment.  Mr. Hicks told Dr. Thein that Wright was "a long term program person," from which it can be inferred that the Mission will support Wright for a long time.  For these reasons, Wright's work history in the highly supportive environments of prison and the Mission is not indicative of his ability to function in a competitive job setting.

Although acknowledging that Wright is "working in a structured environment," the ALJ declined to consider whether that work "is comparable to the same work for pay" as "not fully relevant" because he based his "decision on the entire record."  Tr. 22.  Since the

"entire record" fails to support any reason given by the ALJ to reject Dr. Thein's opinion, this reasoning also fails.

For these reasons, the ALJ erred in failing to give clear and convincing reasons to reject Dr. Thein's opinion.

## II.    <u>Medical Opinion of Dr. Cole</u>

Dr. Cole examined Wright on May 8, 2010, five months after his release from prison. Tr. 499–504. The ALJ gave "some weight" to his opinion "that [Wright] has only mild problems completing simple, multiple-step tasks," but nonetheless adopted his limitations as consistent with Wright's RFC. Tr. 21. In fact, Dr. Cole's full assessment is inconsistent with the ALJ's RFC. Dr. Cole observed that Wright exhibited symptoms consistent with his diagnoses of Bipolar Disorder and PTSD, including "problems in the areas of attention and concentration" such as "some difficulty sustaining simple routine tasks" and "mild problems completing a simple multi-step task." Tr. 504. According to Dr. Cole, Wright had difficulty completing simple tasks, which is contrary to the ALJ's RFC finding that Wright could perform "simple work on a sustained basis." Tr. 18.

The ALJ also stated that Dr. Cole's GAF score of 39 was inconsistent with "the psychologist's essentially normal mental status examination." Tr. 19–21. However, Dr. Cole's assessment does not indicate a normal mental health examination. He observed symptoms consistent with diagnoses of Bipolar Disorder and PTSD, as well as behaviors characteristic of ADHD and a personality disorder, for which he recommended further assessment. Tr. 504.

The ALJ also questioned "the reliability of this opinion given that [Dr. Cole] notes that [Wright] did not put forth adequate effort." Tr. 21. However, Dr. Cole did not find this

lack of effort to have a significant, negative affect on his assessment.  He stated that Wright

tended to give up easily on tasks designed to assess his memory capabilities," and

"[t]hroughout the testing, it can be noted that there was some evidence of poor effort;

however, overall there appeared to be no significant inconsistence in the client's responses

on the various tasks requested of him."  Tr. 502.  Instead, Dr. Cole found this behavior to be

a symptom of his mental health diagnosis that would pose a challenge to vocational

placement in the future.  Tr. 504.

For these reasons, the ALJ failed to give legally sufficient reasons for not fully

crediting Dr. Cole's opinion.

## III.    **Remand**

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir

2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits

is appropriate when no useful purpose would be served by further administrative proceedings or

when the record has been fully developed and the evidence is insufficient to support the

Commissioner's decision.  *Strauss v. Comm'r*, 635 F3d 1135, 1138-39 (9th Cir 2011).  The court

may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a

claimant is disabled under the Act.  *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate

award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for

rejecting the evidence; (2) there are no outstanding issues that must be resolved before a

determination of disability can be made; and (3) it is clear from the record that the ALJ

would be required to find the claimant disabled were such evidence credited."  *Id*.  The

"crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9th Cir 1991). The reviewing court declines to credit testimony when outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by rejecting the opinion of Wright's treating psychiatrist, Dr. Thein, in favor of opinions by non-examining psychologists, and giving Dr. Cole's opinion only "some weight." Thus, those opinions should be credited as true. *See Harman*, 211 F3d at 1179; *Smolen*, 80 F3d at 1281-83.

Turning to the other two facets of the *Harman* inquiry, this court finds no outstanding issues that must be resolved before a determination of disability can be made, and the record is clear that the ALJ would be required to find Wright disabled if the evidence is credited. Crediting Dr. Thein's opinion that in "a normal work-like setting, [Wright] would be extremely likely to undergo a serious decompensation" renders Wright incapable of performing any job in the national economy.

Accordingly, this case is remanded for the immediate payment of benefits.

## ORDER

For the reasons discussed above, the Commissioner's decision is REVERSED and REMANDED for an award of benefits pursuant to sentence four of 42 USC § 405(g).

DATED February 3, 2015.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge
